DOWNEY, Judge,
concurring specially:
The main ultimate issues to be tried by the jury in this case were: 1) were the defendant-property owners negligent; 2) was Mrs. Cole negligent; 3) if both parties were negligent, what was the degree of each party’s negligence; and 4) what damages was Mrs. Cole entitled to recover?
The evidence in this record would adequately support a jury’s finding that either the property owner and Mrs. Cole were both negligent, or that one of the parties was negligent and the other not negligent. Thus, the testimony of an expert witness that under the circumstances of this case Mrs. Cole conducted herself as a reasonably prudent person would have done is, in my judgment, an unwarranted incursion into the sphere of influence belonging solely to the jury.
Mrs. Cole testified that she had lived in the area all of her life and had been swimming, fishing, and clamming in this area many times. By her own account she was a competent fisherperson and was knowledgeable about the changing of the tides. Mrs. Cole knew that because of the changing tides, the water into which she dived was shallow at low tide and deeper at high tide. She actually observed and knew the tide was going out swiftly on the afternoon in question. She testified that: “You could look around and see shallow places and deep places.” Finally, after Mrs. Cole fully disclosed her intimate knowledge of the location in question and most of the environmental factors affecting the area, she was asked if she could explain why the accident happened. Her forthright reply was: “I don’t know. I guess I just didn’t pay enough attention to the depth of the water.”
With that background plaintiff adduced the deposition testimony of Dr. Isadore Scherer, a psychologist of sound qualifications as previously noted by this court in Seaboard Coast Line Railroad Company v. Hill, 250 So.2d 311 (Fla.4th DCA 1971). Plaintiff propounded to Dr. Scherer a hypothetical question which set forth the factual setting as Mrs. Cole viewed it, including Mrs. Cole’s intimate knowledge of the area. The hypothetical question ended in the following way:
“Assuming all of those factors which I have just given you, do you have an opinion as to how a reasonably prudent individual under the same circumstances and conditions as those I have given you, would act, based upon your skill, experience, education and training?”
Dr. Scherer responded:
“My opinion is that a reasonably prudent individual could get into this accident because of the nature of the situation and the other factors that you described in your hypothetical. I am making one assumption from this exhibit.”
* % % :f: sk ¡Js
“Going back to what I said before, relative to the approach to analysis of an accident, we then go to the variables such as point one, what information the individuals have before the accident occurred, *881 and I feel that if we check, the informational input to her was degraded to some extent because there was no sign that— there was no warning about whether or not she should or, should not dive, so that there is no signal for danger; in other words, her set in this situation is not what it might be in order to avoid getting into an accident.
“Also, I notice that the angle she dove from on the basis of that map, was southwest, would mean that she may have been looking in the sun, and that, of course, would make it a little more difficult for her to judge the depth factor; whether she thought about it or not, I mean, it’s something that one would use.
“You said the water was murky, which of course, would also interfere with the fact of making decisions relative to depth. Also, there is a statement that you made that she had been diving in that area for, or been swimming in that area for some 20-odd years, and so that the likelihood is that she dove in that, in the area, in the general area which she dove again on the day of the accident, and probably also saw others diving from time to time.
“Making decisions, one uses past habits or past recall. And if we accept the idea that she-had been diving there before, she had never gotten in an accident, her experience in that area made her feel that she knew what she was doing, so that we have in a sense what is often called a human error, which is habit interference, which is a common human error in which one’s past habits will have an input to what one does. And this is the decision-making process, and sometimes is hindered by the logic of the situation when there is a habit pattern to interfere. There was, from what was noted above, no signals of danger so that there was not a set to be concerned; in other words, one wasn’t prepared to be able to feel that, I got to watch out, at least in the general area in which she had been swimming before, or had been visiting before, had jumped before.
“So here alertness to the situation is downgraded because of that factor. So, in the sense she acted from reduced observation, that is a downgrading of the capacity to have the signals by which she can make proper judgment.
“There is the input of the human error factor because of past habits. There is the possibility that she is unable to see because of the direction in which she was facing. I think, too, there are other variables that make for one acting faster in one situation than another, and this is, it is the Fourth of July. She is feeling happy. She is enjoying herself. It is a holiday, and she just jumps so that the emotional tone was set for doing something like this. And it is for these reasons that I feel that I, any other person in the same situation could very well do what she did. And this would be a reasonably prudent person that would get into this situation.”
After the witness concluded the answer to that hypothetical question, counsel for plaintiff asked:
“Q (By Mr. Ricci.) All right. Doctor, I’m going to ask you now on a completely different set of facts and circumstances, whether or not you are familiar with the particular facts and circumstances in this case; whether or not you have read the deposition of the plaintiff, Charlotte Cole—
“A I read the depositions.
“Q Have you read the depositions of the other eyewitnesses who were present, namely Laura Bostrum, Linda Griffin and the plaintiff’s son, Carl Cole?
“A Yes, I did.
“Q Have you seen photographs of the actual accident scene?
“A I did.
“Q And you have already testified that you have seen a survey map of the area showing the detail of the area?
“A I have.
“Q All right. Based upon the information which you received from reading those depositions, viewing those photographs and looking at the survey, do you *882 have an opinion as to how a reasonably prudent individual under the same conditions and circumstances as the plaintiff in this case, would act, based on your skill, experience, education and training, an opinion other than the one which you have already given us in the hypothetical? (Emphasis added.)
“A No. That’s my answer to the question, your hypothetical.”
The foregoing testimony was admitted over appellant’s objection, the trial court relying upon the Hill case, supra, as authority.
I am cognizant of the trend which often leads to cases being tried as a battle of experts. The breadth and scope of expert testimony seems to be ever increasing.[1] But if we have reached a point in time when in a negligence suit an expert can render his opinion on one of the main ultimate issues the jury is to decide then we have eliminated one of the most important functions which juries perform, viz., determination of what a reasonable person would do under a specified set of circumstances. In Hill, supra, this Court held that Dr. Scherer was competent to render an opinion as to whether an average driver would have seen the train with which the plaintiff’s decedent had collided in time to have avoided the collision. This court pointed out that the subject matter of the opinion was not just the visibility of the train but also the deceptive quality of the various other factors that were present in the environment as shown by the evidence. And so the court ruled that “[t]he significance of and the reaction of a human being to these factors might reasonably be held to involve a knowledge that was within the sphere of the witness’ expertise and beyond the scope of the common knowledge of jurors.” 250 So.2d at 315. The environmental factors referred to were darkness, fog, a black street, dark railroad cars, and lights beyond the crossing. With all the complimentary things which have been written about the wisdom of juries in past cases can it seriously be said that juries need an expert to tell them that darkness, fog, dark streets, absence of flares, and dark objects such as railroad cars diminish the perception of an auto driver at night? And if those things are matters of common knowledge then the expert testimony is not admissible. Johnson v. State, 314 So.2d 248 (Fla.1st DCA 1975).
It might be that an expert’s description of the effect which certain observations have on one’s senses would be helpful to a jury if they involve obscure situations not ordinarily experienced by the average man. But to hypothesize routine experiences and then call upon the expert to opine whether a party’s conduct was negligent is a complete usurpation of the jury’s function and purpose. Yet, that is just about what happened in Hill, when the expert was allowed to testify that, because of the environmental factors involved there (the darkness, fog, absence of lights or flares, dark railroad cars and lights beyond the railroad tracks), an average driver would not have seen the train in time to have avoided the collision.
Nor do I believe in the present case that we could resort to the harmless error rule to justify this decision. It is impossible to determine the neutralizing effect of Dr. Scherer’s testimony on the other evidence of Mrs. Cole’s negligence. For aught we know, that testimony could have persuaded the jury that Mrs. Cole was totally free of negligence because, as he testified, “a reasonably prudent individual could get into this accident . . . .”
In my judgment the decision in Hill approving the admissibility of Dr. Scherer’s testimony concerning what the average driver would do or not do is an unhappy one. However, it is a decision of this court and I feel constrained to follow it.
*883 I therefore reluctantly concur with Judge Alderman that the judgment appealed from must be affirmed.

. Other recent cases in which “human factors engineers” testified as experts are Seaboard Coast Line Railroad Company v. Helman, 330 So.2d 761 (Fla.4th DCA 1976), quashed Helman v. Seaboard Coast Line Railroad Company, Fla., 349 So.2d 1187, Opinion filed July 28, 1977; Seaboard Coast Line Railroad Company v. Welfare, First District Court of Appeal, 350 So.2d 476, Opinion filed September 12, 1977.